**Jerry E. McDANIEL and Christina W. McDaniel, Appellants,**

v.

**CHICAGO TITLE INSURANCE COMPANY, Appellee.**

**No. 09–92–057 CV.**

Court of Appeals of Texas, Beaumont.

Feb. 18, 1993.

Robert Thomas, Houston, for appellants.

Stephen A. Grimmer, Cantey & Hanger, Dallas, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

Appeal from a judgment granting a motion for summary judgment in favor of the Chicago Title Insurance Company. Jerry E. McDaniel and Christina W. McDaniel, husband and wife, instituted a lawsuit complaining of appellee. This cause of action was filed basically pursuant to the provision of the TEX.BUS. & COM.CODE ANN. § 17.41, *et seq.*, (Vernon 1987), popularly known as the Deceptive Trade Practices–Consumer Protection Act.

In mid-October 1991 the appellee filed a defendant's motion for summary judgment. A hearing on the motion was conducted and concluded in late November 1991. The motion for summary judgment was granted and this appeal timely followed.

The appellants' point of error sets out that the trial court committed fundamental error in granting the motion for summary judgment because there was and is a genuine issue as to a material fact and hence, the moving party was not entitled to a judgment as a matter of law on the issues expressly set forth in the motion itself.

The appellants contend that on or about July 5, 1983, the McDaniels executed a Residential Earnest Money Contract. The McDaniels contracted to purchase a residence from one Dean Couch d/b/a Couch Mortgage. In that contract the McDaniels contracted with Couch Mortgage for a policy of title insurance covering the purchase of the residence in question.

On or about August 4, 1983, the McDaniels attended a closing session conducted at the Gulfland Title Company. At the closing, the McDaniels purchased the residence that was located at 1926 Clipper Court in Willis, Montgomery County. This was the location and address of the residence for which the McDaniels paid or contracted to pay $88,000. At the closing meeting a title policy in the amount of $88,000 was purchased from the Chicago Title Insurance Company. The premium in the amount of $681 was paid to the title company. The title insurance policy guaranteed to the McDaniels that their title to the premises and the home in question was both good and indefeasible.

In mid-September 1983, the deeds and other evidence of title were properly filed and recorded. On September 23, 1983, the title policy from Chicago Title Insurance Company was issued to the McDaniels. The McDaniels lived in the home and established it as their homestead.

Then, on or about December 14, 1988, a bankruptcy trustee of Couch Mortgage notified the McDaniels that they did not have a good and indefeasible title to their home. Before and during the closing transaction, Couch Mortgage selected the title company and also the title insurance company involved in this transaction. After the trustee's notice, the McDaniels were then made aware that prior to their purchase of their residence that the Couch Mortgage had previously sold the residence to another buyer on April 11, 1983. This previous real estate transaction had been filed and recorded in the records of Montgomery County on April 11, 1983, and, hence, was a public record on the date of closing. Inasmuch as Couch Mortgage had previously relinquished their title to another buyer, then Couch Mortgage did not possess a good and indefeasible title to sell and deliver to the appellants. The public record was open to Chicago Title Insurance Company and Gulfland Title Company.

Appellants filed a response including an affidavit. We are to accept the affidavit as true and correct. The affidavit states that the Residential Earnest Money Contract expressly provided that the purchase of the home would be guaranteed by a policy of title insurance and that at the same closing appellant Jerry McDaniel was notified that a Policy of Title Insurance was purchased on that date. The affiant swears that on September 23, 1983, he was issued a title insurance policy from Chicago Title Insurance Company for the premium amount of $681 which was paid and that that insurance policy guaranteed that the appellants had good and indefeasible title to the premises, land and homestead. Also, in the affidavit, the affiant vows that he received a written communication from Gulfland Title Company which

clearly showed no outstanding liens on the purchased homestead.

The McDaniels became aware of a preexisting lien and a conflicting lien on or about December 14, 1988. That December date was the first notice and discovery that the representations and written provisions of the McDaniels good and indefeasible title by Chicago Title Insurance Company were false, misleading and deceptive. Dean Couch and Couch Mortgage simply did not have good title to deliver to the McDaniels as guaranteed by Chicago Title Insurance Company.

The affiant concludes by swearing that he relied on the misrepresentations of the agents of the appellee.

The appellants herein specifically argue that Dean Couch, Couch Mortgage, and the Gulfland Title Company were the agents, servants, employees, and representatives of Chicago Title Insurance Company. The property was vacated. The lawsuit was filed within two years of the discovery of the misrepresentations.

The earnest money contract provided that a title policy was to be furnished. It was to be an Owner's Policy of Title Insurance. The title policy shall guarantee the buyers title to be good and indefeasible subject only to any reservations or exceptions that are contained in the deed itself.

■ The Owner's Policy of Title Insurance that was provided by the appellee expressly states in substance that the:

## CHICAGO TITLE INSURANCE COMPANY

a Missouri corporation, hereinafter called the Company, for value does hereby guarantee to the Insured (as herein defined) that as of the date hereof, the Insured has good and indefeasible title to the estate or interest in the land described or referred to in this policy.

The Title Insurance Act as set out in TEX. REV.CIV.STAT.ANN. art. 9.02(a) (Vernon 1981) contains a definition of title insurance. Title insurance is defined as:

"Title Insurance" means insuring, guaranteeing or indemnifying owners of real property or others interested therein against loss or damage suffered by reason of liens, encumbrances upon, or defects in the title to said property, . . .

TEX.REV.CIV.STAT.ANN. art. 9.34 (Vernon Supp.1993) mandates in substance that:

No policy or contract of title insurance shall be written unless (1) there has been compliance with the provisions of Article 9.30(B), (2) said policy or contract of title insurance is based on an examination of title made from title evidence prepared from an abstract plant owned, or leased and operated by a licensed Texas title insurance agent or direct operation for the county in which the real property is located, (3) there has been made a determination of insurability of title in accordance with sound title underwriting practices, and (4) evidence thereof shall be preserved and retained in the files of the title insurance company, direct operation, or title insurance agent for a period of not less than fifteen (15) years after the policy or contract of title insurance has been issued.

TEX.REV.CIV.STAT.ANN. art. 9.30(B) (Vernon Supp.1993) states:

This Article may not be construed as prohibiting:

(1) a foreign or domestic title insurance company doing business in this state under this Chapter, from appointing as its title insurance agent pursuant to this Chapter a person owning or leasing and operating an abstract plant of such county and making the arrangement for division of premiums with the agent as shall be set by the Board;

Hence, statutorily, art. 9.30(B) specifically provides and permits either a foreign or a domestic title insurance company to appoint as its title insurance agent a person owning or leasing an abstract plant in the pertinent county. And, of course, a division of premiums with that agent is permitted. Hence, a strong, deducible inference and conclusion can be drawn that Chicago Title Insurance Company had as its title insurance agent Gulfland Title. Gulfland Title Company countersigned as an Authorized Signatory for and on the policy of Chicago Title Insurance

Company. Chicago Title Insurance Company's logo was used as was Chicago Title's policy form. "Countersigned" indicates the signature of a secretary or other subordinate officer to any writing signed by the principal to show authenticity.

■ Clearly then the express provisions of the earnest money contract, as well as the title guarantee policy itself and the crucial affidavit of Jerry McDaniel when construed pursuant to the above cited statutes create genuine issues of material facts. Hence, the appellee has not shown that it is entitled to the summary judgment as a matter of law. The appellee takes the position that its contract is only one of indemnity and does not "guarantee" a good and indefeasible title to the property. We disagree with appellee's contention under this record.

■ In its motion, the appellee contends that a release of any conflicting or defeating lien satisfies the title company's obligations and all of its obligations to the insured. The appellants contend that they were never advised about any curative matters. Appellants are suing under the DTPA. Their suit is not limited to a recovery strictly on the insurance policy.

*The conflicting lien was not released until April 2, 1991. This April 1991 date is about four months after the appellants filed their lawsuit.* This release occurred after the McDaniels had vacated the residence. The McDaniels contend and we think properly so that the filing of their own lawsuit brought about the release and its recordation. We hold that the appellants have shown that there are genuine issues of material facts under the DTPA. One major thrust of the appellants' cause of action is that representations and misrepresentations were made at the time of closing and were reaffirmed and made more manifest in later written documents. Appellants are entitled to their day in court.

The judgment is reversed and the cause is remanded for a full trial on the merits.

**REVERSED AND REMANDED.**